## WAIT vs. DAY.

Where a grant of land is made to one person and the consideration therefor is paid by another, though no trust results to the party who made the payment, for his own benefit, yet as to the then creditors of such party there is a resulting trust, which will enable them to sell the land on their executions.

Where the consideration is paid in order to satisfy a moral obligation which the party paying it owes the one to whom the grant is made, no trust in favor of creditors results from the transaction.

Therefore the father of an illegitimate child may pay for land purchased for the mother, and have it conveyed to her without exposing it to the claims of his creditors, provided it appear to have been done to reimburse her for expenditures in the support and education of such child.

But where the payment is by way of gift to the grantee, or to furnish facilities for future illicit intercourse between the parties, or upon any trust for the benefit of the party paying, and in all cases where he was under no legal or moral obligation to pay the money, the payment is a fraud upon creditors, and the land is liable to be sold on their executions.

A gift made by a debtor to one who lays out the money in land which is conveyed to the donee, does not render the land liable to execution at the suit of the creditor of the donor. *Per* BRONSON, C. J.

Where the father of two illegitimate children paid the purchase price of a house and lot which was purchased by the mother, and which was conveyed to her, and where he was accustomed to visit her, and the property was afterwards sold on a *fi. fa.* at the suit of a creditor of the father; *held*, that the intent with which the payment was made was a question of fact, and that it was erroneous for the circuit judge to hold, in ejectment by the purchaser, that the payment was made to satisfy an obligation which the debtor was under to the grantee, and that no trust in favor of his creditors resulted from the transaction.

EJECTMENT for a house and lot in the village of Sandy Hill, Washington county, tried in that county before WILLARD, circuit judge, in June, 1844. The plaintiff claimed the property as a purchaser at sheriff's sale on a judgment against George R. Barker. Barker formerly resided at Sandy Hill, and was cashier of the Washington and Warren Bank. The defendant, who was a single woman, also resided at Sandy Hill, and had two illegitimate daughters of which Barker was reputed to be the father. One of the children was born about the year 1829, and the other about the year 1832; and both are still living

The Washington and Warren Bank failed; and soon afterwards Barker himself failed, and removed to the city of New-York, where he has since lived: and ever since his failure, he has either been insolvent, or his property has been so concealed that his creditors have been unable to reach it. On the 12th of June, 1833, Solomon and Hiram Parks recovered a judgment in this court against Barker and two others for $160,12. The judgment was afterwards revived by *sci. fa.*, and costs added to $22,75.

On the 2d September, 1834, the defendant entered into a written contract with Seth Smith for the purchase of the house and lot in question for the sum of $600: of which sum $100 was to be paid down; $50 on the first of October following; $50 on the first of May, 1835; and $100 on the first day of May in each of the years 1836, 1837, 1838 and 1839. When the payments were completed the defendant was to have a deed. She gave her notes for all the instalments, except that which was to be paid down; and that she paid in a note of $100 against one Nash. Nash had given the note to Barker for property purchased of him; and Barker let the defendant have the note to pay towards the land in question. The defendant had no means of support other than what she got from Barker; and she frequently told Smith that she expected to get the money to pay for the property from Barker. She told him so as the payments became due, and said she had got to send to Barker for the money. The defendant went into possession on making the contract, and has continued in possession ever since. Barker has continued to make her occasional visits every year since he left Sandy Hill. He has visited her at her said residence both by day and by night. When the defendant was about to pay one of the notes in Canada money, she said Barker had sent her the money from New-York. About the time the last of the defendant's notes fell due, (May 1, 1839,) Barker called on Smith at Sandy Hill and asked further time for the payment of the money, which was granted on his paying the interest; and Barker then paid the interest, amounting to $35, to Smith. In June, 1840, the defendant desired that this

Wait *v.* Day.

note should be sent to New-York to Barker for payment, who, she said, would pay it at sight. The note was sent, and Barker paid it.

Other evidence was given tending to show that all the money paid for the property in question, was either paid by, or came from, Barker. The payments having been completed, Smith, on the 8th of August, 1840, executed a deed to the defendant in pursuance of the contract. In December, 1842, the property was sold on an execution upon the aforesaid judgment against Barker and others ; and the plaintiff became the purchaser for the sum of $186,96. On the 12th of April, 1844, the sheriff executed a deed to the plaintiff in pursuance of the sale.

The plaintiff insisted that the facts proved were sufficient to entitle him to a verdict; or at the least, were sufficient to go to the jury, and ought to be passed upon by them. But the judge ruled, that there was no resulting trust, even granting that the whole consideration or purchase money had been received by the defendant from Barker : that the presumption from the ev idence was, that the money so advanced and paid by Barker was paid at the instance of the defendant, in discharge of the moral obligation which Barker was under to the defendant for the consequences of the past illicit intercourse between them, which was a good consideration ; and the plaintiff therefore took nothing by the sheriff's deed. A nonsuit was ordered ; and the plaintiff moves for a new trial on a bill of exceptions.

*N. Hill, Jr.* for plaintiff, cited 1 *R. S.* 728, §§ 51, 52 ; 2 *id.* 368, § 26 ; 1 *R. L.* 74, § 4 ; 19 *Wend.* 415 ; 3 *John.* 216 ; 1 *Wend.* 625.

*S. Stevens,* for defendant. The creditors of Barker could not sell. If there was any trust, it could only be enforced in a court of equity. But if we are wrong in this, still the nonsuit was properly ordered.

*By the Court*, BRONSON, Ch. J.   Under the old law of uses and trusts, when lands were conveyed to one person, and the consideration was paid by another, there was a resulting trust in favor of him who paid the money ; and the statute 29 *Car.* 2, *c.* 3, § 10, which was re-enacted in this state, subjected the lands to judgments and executions against the *cestui que trust* in the same manner as though he had been seized of the legal estate.   (1 *R. L.* 74, § 4.)   Under the present statute, no use or trust results in favor of him who paid the money ; and the title vests in the person named as alienee in the deed.   But the conveyance is presumed fraudulent as against the creditors, at that time, of the person paying the consideration ; and if a fraudulent intent is not disproved, a trust results in favor of those creditors, to the extent which may be necessary to satisfy their just demands.   (1 *R. S.* 728, §§ 51, 52.)   The chancellor has said, that the creditors cannot sell the land on execution. (*Brewster* v. *Power*, 10 *Paige*, 562.)   But the case did not call for a decision of the question ; and I think the 45th section of the statute of uses and trusts must have been overlooked.   By that section it is provided, that "every estate and *interest* in lands shall be deemed a legal right, cognizable as such in the courts of law, except when otherwise provided in this chapter." There is nothing in the chapter which forbids that this trust or interest should be "deemed a legal right ;" and it can only be "cognizable as such in the courts of law" by allowing the creditors to sell the land on their executions.   As I read the 51st and 52d sections, a trust never results for the benefit of the person who pays the consideration ; but only for the benefit of his creditors.   It does not result *to*, but "in favor" of the creditors.   It results to the debtor, for their benefit.   And then the 45th section turns the equitable interest of the debtor in the land into "a legal right, cognizable as such in courts of law," and, of course, subject to sale on execution.   Upon this construction, creditors will have the same direct and speedy remedy now, which they had under the former statute.   They were not then obliged to resort to a court of equity to obtain their

rights; and I can see no reason why they should be sent there now.

Uses and trusts are not wholly abolished : they are only modified. (§ 45.) And it is expressly provided, that in a case like this a trust shall result. (§ 52.) It can only result *to* the debtor, though it is "in favor" of the creditor, and him only.

The legislature only intended to make two changes in this branch of the law. The first was, to discourage the purchase of lands in the name of another, by cutting off any resulting use or trust, so far as the person paying the consideration is himself concerned. And the second restricts the trust for the benefit of creditors, to such as are creditors at the time the money is paid. In other respects, the law remains as it was before. If A. pays the consideration, and the conveyance be to another, there is a resulting trust to A. for the benefit of such persons as are then his creditors : and this trust, which in its nature is of equity cognizance, is transformed by the statute into a legal right, which may be handled in a court of law.

If this question had been settled the other way by the court of chancery, we should probably have followed the decision. But there is nothing more than a *dictum* of the chancellor, by which he would not feel himself concluded should the question be directly presented for adjudication.

If Barker paid the consideration within the meaning of the statute, the land was properly sold to satisfy his creditors ; and the plaintiff made out a plain case. Barker was insolvent, and the judgment was recovered before the land had been purchased. Paying for lands which were purchased in the name of another, instead of applying the money in satisfaction of debts, was a palpable fraud upon his creditors ; and there was nothing—if, indeed, there could by any thing in such a case—to disprove a fraudulent intent. A trust consequently resulted for the benefit of creditors.

The next question is upon the payment of the consideration. The words of the statute on that point are as follows : " Where a grant for a valuable consideration shall be made to one person, and the consideration therefor shall be paid by another,"

" such conveyance shall be presumed fraudulent as against the creditors, at that time, of the person paying the consideration." The evidence tended to show, and on the ruling at the circuit it must be assumed, that the whole of the purchase money for the land was paid by Barker. A part of it was paid directly from him to Smith, the vendor ; but the greater portion was paid through the defendant. But the form in which the business was done is not material : the question is upon the true character of the transaction. If Barker owed a debt to the defendant, and at her request paid the money to Smith on account of her purchase, that would not give Barker or his creditors any interest in the land. And on the other hand, if the purchase was made by Barker, either directly or indirectly, or upon any trust, express or implied, for his benefit, his payment of the consideration, through the defendant, instead of making it directly to the vendor, would not take the case out of the operation of the statute. The law regards substance ; and not mere form.

I have already said, that if Barker was paying his own debt there was no resulting trust. And although he may have been under no legal liabilty to the defendant, yet if he paid the money in discharge of what he deemed a moral obligation to indemnify the defendant against the consequences which had already resulted from their illicit intercourse, I think the case would not be within the statute. He had made her the mother of two illegitimate children, and was at liberty to refund the money which she had already expended for the necessary support and education of those children. Where there is an existing obligation, either legal or moral, to pay so much money, and the payment is not made with any reference to the future, nor by way of mere gratuity, the case is not within the mischief against which the legislature intended to provide. But when the payment is made by way of gift to some favorite whom the debtor may be willing to prefer before his creditors ; or the purchase is made upon any trust, express or implied, that the debtor shall in any form reap the fruits of it ; and in all cases where there is no present duty, legal or moral, to pay the money, the

payment is a fraud upon creditors, and they can, I think, reach the land by their judgments and executions. If there be any exception, it must be where the land is purchased in the name of, or by way of advancement to a wife or child. (*Guthrie* v. *Gardner*, 19 *Wend.* 414.) I see no principle upon which a purchase of that kind, by one who is a debtor at the time, can be allowed to stand as against those who were then his creditors. But however that may be, I think it quite clear that a purchase made by way of gift or advancement to a mistress, although it may not look to future cohabitation, cannot be supported. Creditors have a higher and better claim than such a woman. It is hardly necessary to add, that a payment which looks to future cohabitation cannot for a moment be defended as against creditors.

It must be understood that I am all the while speaking of a case where the debtor stands in some degree connected with the purchase of the land. If, without any reference to a purchase, past or prospective, he gives money to a mistress or any one else, which is laid out in the purchase of real estate, I do not see how the creditors can seize the land under this statute. Their remedy would be in a court of equity.

The circuit judge held, that the presumption from the evidence was, that the money advanced by Barker was paid at the instance of the defendant, in discharge of the moral obligation he was under to the defendant for the consequences of the past illicit intercourse between them. I have not been able to see that the evidence tended so strongly to that conclusion, and against any other inference, as to make it proper to take the case out of the hands of the jury, and nonsuit the plaintiff. There was nothing to show that Barker had not previously discharged all the obligation, legal or moral, which could have arisen out of the past intercourse of the parties, so far as that obligation could be measured by money. During the greater part of the time he had been solvent: and the history of most men who have kept a mistress goes to prove that they have paid at the time as much, at the least, as they could afford to pay, or the woman ought to receive. Indeed, such men, unless

they have large estates when they begin, generally become insolvent; and if they have charge of the money of others, the probability is, that they will prove faithless to their trust. Barker became insolvent, and so did the bank of which he was cashier, while this illicit connection was going on ; and had the case been left to the jury, they might have thought that when the land was purchased and the consideration paid, Barker was under no obligation to the defendant, either legal or moral, on account of past transactions.

But this is not all. Although Barker had removed to New-York, he continued his visits to the defendant, which were made in the house which had been purchased with his money. It is quite possible that he paid the consideration as a mere gratuity to his paramour ; or that she was to hold the property in trust for his benefit ; or, at the least, that the purchase was made for the purpose of facilitating their future illicit intercourse. If a jury should arrive at either of these conclusions, it would be their duty to find a verdict for the plaintiff. The claims of creditors are superior to those of bankrupts and unchaste women, although the latter may claim the merit of having been seduced.

Without intending to intimate any opinion as to what the verdict should be, we think the case should not have been taken from the jury.

New trial granted